# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| PACE AIRLINES, LLC, et al., | ) | CASE NO. 5:08 CV 771 |
| | ) | |
| PLAINTIFFS/ COUNTER CLAIMANTS/ CROSS DEFENDANTS, | ) ) ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| PROFESSIONAL SETTLEMENT SERVICES, LLC, et al., | ) ) | |
| | ) | |
| DEFENDANTS/ THIRD PARTY PLAINTIFFS, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| GLOBAL USA HOLDING, INC., et al., | ) | |
| | ) | |
| THIRD PARTY DEFENDANTS/ COUNTERCLAIM DEFENDANTS/ CROSS CLAIMANTS. | ) ) ) | |

Before the Court is the plaintiffs' motion seeking summary judgment on their first amended complaint against the defendants, on their first amended counterclaim against the third-party defendants, and on the crossclaim of third-party defendants against the plaintiffs. (Doc. No. 89.)[1] Defendants filed a brief in opposition (Doc. No. 90) and plaintiffs filed a reply (Doc. No.

---

[1] The pleadings in this case are rather confused. In summary: the pleadings addressed by plaintiffs' motion for summary judgment are: (1) Plaintiffs' First Amended Complaint (Doc. No. 55) [the Answer is Doc. No. 62]; (2) Plaintiffs' First Amended Counterclaim (Doc. No. 73) [the Answer is Doc. No. 74]; and (3) Global's Crossclaim (Doc. No. 66) [the Answer is Doc. No. 72]. There is also a third-party complaint in this case (Doc. No. 63) filed by Professional Settlement Services, LLC, Marilyn Mannarino and Susan Mannarino against Global USA Holding, Inc., Bruce Gillette, and John Kunkel [the Answer is Doc. No. 66]. There is no motion for summary judgment addressing the third-party complaint.

91.)[2] For the reasons set forth below, plaintiffs' motion is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

On November 14, 2007, plaintiffs Pace Airlines, LLC and Pace Airlines II, LLC as seller (collectively "Pace" or "plaintiffs") and third-party defendant Global USA Holding, Inc. as purchaser ("Global") entered into a written Purchase and Sale Agreement ("the Purchase Agreement") wherein Pace agreed to sell and Global agreed to buy all of Pace's stock in Pace Airlines, Inc. (Purchase Agreement ["PA"], ¶¶ 2 and 3.)[3] The Purchase Agreement called for the transaction to close no later than November 30, 2007. (PA, ¶ 12.)

Under the Purchase Agreement, Global was required to place an "Initial Earnest Money Deposit" of $500,000 ("the Deposit") into escrow with defendant/third-party plaintiff Professional Settlement Services, LLC ("PSS"). Paragraph 3.3 provided:

> Purchaser represents and warrants that the sum of $500,000 has been deposited with Professional Settlement Services, Inc. ("PSS") as earnest money, pursuant to acknowledgment of such deposit by letter dated November 2, 2007 (the "Initial Earnest Money Deposit"). In the event the Purchaser fails and/or refuses to consummate the purchase and sale contemplated by this Agreement on or before November 30, 2007, for any reason other than default by the Seller hereunder or as otherwise provided in Paragraph 7 hereof, the Initial Earnest Money Deposit shall be immediately paid to the Seller and the Purchaser shall have no right or claim to said Initial Earnest Money Deposit, or the additional Earnest Money, as provided herein.

---

[2] The third-party defendants/cross-claimants Global USA Holding, Inc., Bruce Gillette, and John Kunkel are not currently represented and failed to file any responses. They were, however, served with copies of both the motion for summary judgment and the order setting all deadlines for the dispositive motion briefing.

[3] A copy of the Purchase Agreement is attached to the motion as Exhibit 1. For consistency, the Court refers to the various parts of the Purchase Agreement as "paragraphs," although the Agreement itself variably uses the terms "paragraph" *and* "section."

(Motion, Ex. 1.)[4]

PSS agreed to serve as the escrow agent for the Deposit in a letter to Pace dated November 16, 2007 ("the Escrow Agreement").[5] The Escrow Agreement provided as follows:

This letter will certify that Professional Settlement Services, LLC ("PSS") is currently holding the sum of $500,000 in immediately available funds (the "Deposit"), as security for the performance by Global USA Holding, Inc., a Nevada corporation, under the terms and provisions of the [Purchase] Agreement. This letter will constitute the acknowledgment and agreement of PSS that, upon receipt of a certification from Pace Airlines, LLC and Pace Airlines II, LLC that Global USA Holding, Inc. has failed and/or refused to consummate the purchase and sale of the common capital stock of Pace Airlines, Inc. pursuant to the [Purchase] Agreement on or before November 30, 2007, PSS will immediately wire-transfer the Deposit in accordance with instructions received from Pace Airlines, LLC and Pace Airlines II, LLC.

PSS hereby acknowledges that Pace Airlines, LLC and Pace Airlines II, LLC will materially rely upon this letter acknowledgment and agreement in execution and delivery of the [Purchase] Agreement.

Defendant Susan Mannarino ("Susan M.") signed the Escrow Agreement for PSS as its Managing Partner. Third-party defendant Bruce Gillette ("Gillette") also signed as Global's President/CMO. The Escrow Agreement was sent to Pace in care of its law firm, Fine and Block, in Atlanta.

Paragraph 3.4 of the Purchase Agreement provided:

Upon the Purchaser's payment of the Purchase Price as provided herein, Seller shall execute and deliver to PSS a discharge and release of PSS' undertaking to remit the Initial Earnest Money Deposit.

On November 27, 2007, three days before the anticipated Closing Date, without notice to Pace, PSS disbursed the Deposit to defendant Marilyn Mannarino's ("Marilyn M.")

---

[4] The letter of November 2, 2007 referred to in ¶ 3.3 is attached to the original complaint as Exhibit B. This would have been the Escrow Agreement had it not been replaced by a letter, dated November 16, 2007, which changed certain dates. That November 16, 2007 letter was the final Escrow Agreement. (*See* Compl., Ex. C.)

[5] A copy of the Escrow Agreement is also attached to the motion as Exhibit 2.

business associate, who had funded the Deposit on Global's behalf in exchange for a promise from Global to repay the funds by November 15, 2007[6] with $250,000 interest.[7]

Marilyn M. testified that, several days before the anticipated closing date of November 30, 2007, a Global Advisors'[8] employee told her that the Pace-Global deal was dead. Without any confirmation of this from Pace, Marilyn M. told Daniel Tiffe of Global Advisors that PSS wanted to return the Deposit to Jones as soon as possible, but PSS was concerned about the lack of a release from Pace. Marilyn M. conveyed that concern to Gillette, Kunkel and Global Advisors, whereafter Gillette decided to "release PSS from Pace" stating in an e-mail to Tiffe that "Global will take full legal responsibility[.]" (Marilyn M. Dep. at 112-13, 115; Motion, Ex. 9.)[9] Consequently, as of November 27, 2007, both PSS and Global deemed PSS released from the Escrow Agreement. (Marilyn M. Dep. at 244; Gillette Dep. at 87-88, 101-02.)[10] Marilyn M. then directed Susan M., the Managing Partner of PSS, to release the Deposit to Jones and his

---

[6] This date was later extended to November 30, 2007 to coincide with the Closing Date in the Purchase Agreement.

[7] Deposition testimony reveals that Global was unable to make the $500,000 Deposit required by ¶ 3.3 so defendant Marilyn M., a PSS employee, contacted an acquaintance of hers named Joseph Jones ("Jones"), who had previously done business with PSS. Marilyn M. asked Jones if he would be interested in a deal involving "putting up 500 and making 250 on it in a short amount of time." Jones agreed and a company he controlled, known as Geno Funding, put up the money on a promise that it would be paid back in full, plus the $250,000, by November 30, 2007. (Marilyn M. Dep. at 43-44, 50, 52, 57-59, 61, 65-67, 155; Gillette Dep. at 40, 78-79, 81.) This arrangement with Jones was apparently never disclosed to Pace and Pace argues in its motion that the arrangement "conflicted irreconcilably with [PSS's] fiduciary duty to Pace[.]" (Motion at 5.) More particularly, Pace asserts that "Global and PSS therefore pledged to disburse the Deposit to someone who was *not even a party* to the Escrow Agreement -- and they never disclosed that fact to Pace, which was [a party]." (Motion at 6.) Making matters even more questionable, Jones apparently wanted $30,000 "up front" before he would advance the $500,000. Global did not have the funds, so Marilyn M. herself made the payment. (Marilyn M. Dep. at 80-81, 89.) She chose to do this because Global told her that, if the Pace transaction closed, PSS would serve as Global's title insurance broker in connection with the transaction, another fact never disclosed to Pace. (*Id.* at 83, 84-85, 89.) Susan M. was aware of Marilyn M.'s "investment" but believed it was "her personal money, personal to do what she wanted with it." (Susan M. Dep. at 68.)

[8] Gillette described Global Advisors, LLC as Global's "agent, broker and finder" in the Pace transaction. (Gillette Dep. at 40.)

[9] Marilyn Mannarino testified in this action in her own capacity and as PSS's Rule 30(b)(6) representative as evidenced by the Amended Notice of Videotape Deposition. (Motion, Ex. 3.)

[10] Bruce Gillette testified in this action in his own capacity and as Global's Rule 30(b)(6) representative. (Motion, Ex. 4.)

company. Susan M. did so without any question and without knowing whether anyone at PSS had investigated whether it was okay with Pace to release the Deposit. (Susan M. Dep. at 22, 24-27, 44-45.)

On December 15, 2007, Pace's counsel transmitted to Global written notice that Pace was terminating the Purchase Agreement as a result of Global's "failure and/or refusal to consummate the purchase and sale of the stock of Pace Airlines, Inc. in accordance with" the Purchase Agreement, and notifying Global of Pace's intention "to exercise all of its rights and remedies" in light of Global's default under the Purchase Agreement. (Motion, Ex. 12.)

On that same day, Pace's counsel sent written notice to PSS certifying that Global had "failed and/or refused to consummate the purchase and sale of the common capital stock of Pace Airlines, Inc. pursuant to the [Purchase Agreement] on or before November 30, 2007" and demanding payment of the Deposit to Pace by wire transfer. (Motion, Ex. 13.)

Marilyn M. testified that PSS did not comply with Pace's demand. (Marilyn M. Dep. at 40.) Instead, PSS asked Global to respond to Pace's letter; but Global's attorney stated that this would be a conflict of interest. As an alternative, Global drafted a response that PSS could make on its own behalf. (Marilyn M. Dep. at 160-61; Motion, Ex. 14.) On January 9, 2008,

Global did not close the transaction with Pace by the Closing Date. Global also never declared Pace in default under the Purchase Agreement and never sought to terminate the Agreement on the ground that Pace had failed to fulfill its conditions precedent to closing. (Gillette Dep. at 29.) In fact, Pace was ready, willing and able to perform its obligations under the Purchase Agreement by the Closing Date. (Boyd Decl. ¶¶ 7, 8.)[11]

---

[11] At all relevant times, Reese R. Boyd, III "served as General Counsel to Pace Airlines, Inc., whose stock was owned throughout that time by Pace." (Boyd Decl. ¶ 3.)

Marilyn M. typed that scripted response almost verbatim on PSS letterhead addressed to Pace's counsel. Susan M. then signed the letter on PSS's behalf. (Marilyn M. Dep. at 161-64.) The letter stated:

> Dear Mr. Block:
>
> Relative to the above captioned matter and the additional funds being held in escrow, it is for the following reasons that the money is not being sent to the Sellers:
>
> 1.  Because there was non-disclosure of lawsuits pending against Pace which were not disclosed during due diligence. Pace failed to comply with the purchase agreements [sic] terms and conditions of "full disclosure". Global found out about the pending lawsuits one week prior to closing and when it was disclosed to their partner and lender it hindered the closings both for November 30, and December 15, 2007.
>
> 2.  Pace was unable to provide any documentation to Global USA Holding, Inc. indicating that a settlement was reached between Pace and the plaintiffs in reference to the lawsuits pending. In essence Pace would have been unable to close on the 30th or the 15th of December even if the funding had occurred for Global. To date I have not received any documentation indicating that these issues have been closed. My information is that Global received an e-mail telling them that it would be settled at closing, which has not satisfied their partner and lender.
>
> 3.  Pace failed to demand payment from PSS on the 30th, thus the Agreement between PSS and Pace expired at midnight on the 30th of November 2007 and the money was returned to the lender as per the Agreement with Pace.
>
> I hope this answers any of your questions and puts this issue to rest.
>
> Very truly yours,
>
> PROFESSIONAL SETTLEMENT SERVICES, LLC
>
> Susan Mannarino
> Managing Partner

(Motion, Ex. 15.) Both Marilyn M. and Susan M. conceded they had no idea whether anything stated in the letter was accurate. (Marilyn M. Dep. at 164; Susan M. Dep. at 60.)

6

The instant lawsuit was filed little more than two months after Pace received this letter.

## II. DISCUSSION

**A.        Summary Judgment Standard**

When a party files a motion for summary judgment, it must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial." Rule 56(e)(2). Affidavits filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Rule 56(e)(1).

**B.        Analysis**

**1.        Summary Judgment with respect to Pace's First Amended Complaint and First Amended Counterclaim[12]**

The first amended complaint ("complaint") and the first amended counterclaim ("counterclaim") are interrelated. In Count One of the complaint, Pace alleges that defendants PSS, Marilyn M. and Susan M. breached their fiduciary duties. In Count Two of the complaint and Count One of the counterclaim, respectively, Pace alleges that PSS breached the Escrow

---

[12] As pointed out in n.5, *supra*, Global, Gillette and Kunkel have filed no response to this motion as it relates to them. Therefore, the arguments against the issues raised in the motion are those arguments made by PSS, Marilyn M. and Susan M. (collectively, "defendants").

Agreement and Global breached both the Purchase Agreement and the Escrow Agreement. In Count Three of the complaint and Count Two of the counterclaim, respectively, Pace alleges that PSS, Marilyn M., Susan M., Global, Gillette and Kunkel converted the Deposit. In Count Four of the complaint, Pace alleges that PSS, Marilyn M. and Susan M. tortiously interfered with the Pace-Global Purchase Agreement. And, finally, in Count Five of the complaint and Count Three of the counterclaim, respectively, Pace asserts that PSS, Marilyn M., Susan M., Global, Gillette and Kunkel engaged in a civil conspiracy.

Pace seeks compensatory damages exceeding $500,000, along with prejudgment interest from December 15, 2007, punitive damages in the sum of at least $500,000, and reasonable attorneys' fees and costs.

### a. Breach of Fiduciary Duty (Complaint Count One)

Resolution of this claim depends on whether PSS had a right under the Escrow Agreement to release the Deposit to someone other than Pace, without Pace's knowledge and/or authorization. The defendants argue that there is a material *factual* dispute as to whether the Escrow Agreement authorized PSS to release the Deposit; however, construction of the terms of a contract is a question of law for the Court, not a question of fact.

Under Ohio law,[13] PSS owed a common law fiduciary duty to both Pace and Global, having undertaken to serve as escrow agent for the Deposit. The Ohio Supreme Court long ago described an escrow as follows:

---

[13] Although the Purchase Agreement is to be "construed, interpreted and enforced in accordance with the laws of the State of Georgia[,]" (Motion, Ex. 1, ¶ 18(a)), the Escrow Agreement specifies no particular law and therefore, the Court applies the law of the forum state to determine whether the defendants breached their fiduciary duties. Even so, the law of Georgia is very similar to Ohio's, such that application of that state's law would produce the same result. *See Byrd v. Riggs*, 213 Ga. 593, 597, 100 S.E.2d 453 (Ga. 1957) ("To establish the fiduciary obligations of an escrow, the person with whom the escrowed property is placed must, by mutual consent of both parties, be made the agent of both parties and clothed with authority to deliver the property to one party or the other on the happening of some future event.").

> an escrow in Ohio, as between grantor and grantee [. . .], is witnessed by a written instrument known as an escrow agreement, delivered by mutual consent of both parties to a third party denominated the depositary or escrow agent, in which instrument certain conditions are imposed by both grantor and grantee, which conditions the depositary or escrow agent, by the acceptance and retention of the escrow agreement, agrees to observe and obey.

*Squire v. Branciforti*, 131 Ohio St. 344, 2 N.E.2d 878 (Ohio 1936), Syllabus ¶ 1. An escrow agent must "carry out the terms of the agreement as intended by the parties," *Pippin v. Kern-Ward Bldg. Co.*, 8 Ohio App.3d 196, 198, 456 N.E.2d 1235 (Ohio App. 8 Dist. 1982), and release escrow funds only when the conditions of the escrow agreement have been met, *Spalding v. Coulson*, 104 Ohio App.3d 62, 81, 661 N.E.2d 197 (Ohio App. 8 Dist. 1995). "Escrow is controlled by the escrow agreement, placing the deposit beyond the control of the depositor and earmarking the funds to be held in a trust-like arrangement." *Pippin*, 8 Ohio App. 3d at 196.

The terms of the Escrow Agreement in this case are clear, requiring PSS to hold the Deposit "as security for the performance by [Global]" under the Purchase Agreement, until it received "a certification from [Pace] that [Global] has failed and/or refused to consummate the purchase and sale of the common capital stock of Pace Airlines, Inc. pursuant to the [Purchase] Agreement on or before November 30, 2007[.]" Once Pace's certification was received, PSS was to "immediately wire-transfer the Deposit in accordance with instruction received from [Pace]."

Thus, it was Pace, not Global, that held the authority to trigger the release of the Deposit and, concurrently, the release of PSS from its escrow obligations.[14] There was no provision for Global to authorize release of the Deposit, even though Global had signed the Escrow Agreement and Pace had not.

---

[14] Even under the terms of the Purchase Agreement, if the closing did not occur due to some fault of *Pace*, it was still the entity that had the obligation to return the Deposit. In such case, ¶ 7.02 provided that "*the Seller* shall return all Earnest Money deposits to Purchaser via same-day wire transfer, shall release PSS of any obligation to pay over to Seller the Initial Earnest Money Deposit, and neither party to this Agreement shall thereafter have any further right or claim against the other hereunder." (emphasis added).

*Pippin*, *supra*, admonishes that the very purpose of an escrow is to "plac[e] the deposit beyond the control of the depositor[.]" In this case, the depositor Global wrongfully took control of the Deposit by authorizing PSS to release it and, notwithstanding the terms of the Escrow Agreement, PSS accepted the release by Global and disbursed the funds to Jones's company, Geno Funding. Thus, PSS clearly breached its fiduciary duty to strictly follow the terms of the Escrow Agreement.

Pace also seeks to hold Marilyn M. and Susan M. personally liable for PSS's breach of fiduciary duty. "Ohio law has long held that corporate officers may be held personally liable for actions of the company if the officers take part in the commission of the act or if they specifically directed the particular act to be done, or participated or cooperated therein." *State ex rel. Fisher v. Am. Courts, Inc.*, 96 Ohio App.3d 297, 300 644 N.E.2d 1112 (Ohio App. 8 Dist. 1994) (citing *Young v. Featherstone Motors, Inc.*, 97 Ohio App. 158, 171, 124 N.E.2d 158 (Ohio App. 2 Dist. 1954)); *see also*, *Prymas v. Kassai*, 168 Ohio App.3d 123, 136, 858 N.E.2d 1209 (Ohio App. 8 Dist. 2006) ("liability extends to torts committed by or for the corporation when the officer has participated in the wrong.").

Both Marilyn M. and Susan M. knew that the Deposit was being held in escrow to assure the performance of Global under the Purchase Agreement. Marilyn M. actually obtained the funds making up the Deposit from her acquaintance Jones and later initiated and carried out the wrongful release of the Deposit to Jones. Susan M., as the sole Managing Partner, signed the Escrow Agreement on behalf of PSS and, at Marilyn's direction, released the Deposit to the original investor without any inquiry as to the appropriateness of such action

Therefore, plaintiffs are entitled to summary judgment against PSS, Marilyn M. and Susan M. on Count One of the complaint for breach of fiduciary duty.

10

b.    **Breach of Escrow Agreement (Complaint Count Two); Breach of Purchase Agreement (Counterclaim Count One)**

Pace alleges that PSS breached the Escrow Agreement when it took directions from Global, rather than Pace, and released the Deposit to Jones. Pace further alleges that Global breached the Purchase Agreement when it improperly released PSS from its escrow obligations on November 27, 2007 and authorized PSS to return the Deposit.[15]

The defendants assert that, at the very least, there is a factual dispute over whether Pace had failed to fulfill its obligation under the Purchase Agreement to disclose all litigation and, therefore, had itself breached that Agreement, justifying their automatic return of the Deposit to Jones.

As far as obligations under the Escrow Agreement, as already noted above in the discussion of fiduciary duty, it was *Pace* that had the sole authority to release PSS and provide for disposition of the Deposit by certifying that Global had failed to close under the Purchase Agreement. The Escrow Agreement governed the duties of the defendants and, by failing to honor the terms of that Agreement which allowed release of the Deposit only by Pace, the defendants breached the Escrow Agreement.

The defendants also argue that, under the Escrow Agreement, they were justified in releasing the Deposit because Pace failed to notify them by November 30, 2007 that Global had not consummated the purchase. They point to Gillette's deposition testimony that, when he signed the Escrow Agreement, it was his understanding that Pace's demand for return of the Deposit had to be made by November 30, 2007. (Gillette Dep. at 215.) Aside from the fact that, when construing a contract, an individual's personal belief about the meaning of the contract

---

[15] Pace also argues that this was a breach of the Escrow Agreement on the part of Global.

does not overrule the contract's language, this argument also makes no sense in view of the fact that PSS, at Global's urging, released the Deposit on November 27, 2007, three days *before* the date when defendants claim they were supposed to be notified by Pace if Global had defaulted.

There can be no doubt that PSS breached the terms of the Escrow Agreement when it took *Global's* direction to release the funds to Jones *three days before* the Closing Date in the Purchase Agreement. For that reason, Pace is entitled to summary judgment on Count Two of its Complaint against PSS.

The Court now turns to the question of Global's breach of the Purchase Agreement. The Purchase Agreement provided, in ¶ 3.3, that the Deposit is "earnest money"[16] to which Global "shall have no right or claim" if Global "fails and/or refuses to consummate the purchase and sale contemplated by [the Purchase Agreement] on or before November 30, 2007, for any reason other than default by the Seller [Pace] hereunder or as otherwise provided in Paragraph 7 hereof[.]" Upon such failure by Global, ¶ 3.3 provides that the Deposit "shall be immediately paid to the Seller[.]"

Global's obligation to consummate the Purchase Agreement depended in part on various terms in ¶ 7, one of which was that "[a]ll representations and warranties of [Pace] and [Pace Airlines, Inc.] contained in [the Purchase Agreement] shall be true and correct in all material respects on and as of the Closing Date[.]" (Motion, Ex. 1, ¶ 7.01(b).) The "representations and warranties" required of Pace were set forth in ¶ 4 of the Purchase Agreement and included a section on "Litigation," under which Pace was required to warrant that

---

[16] "Earnest money" is defined as "[a] deposit paid (often in escrow) by a prospective buyer [. . .] to show a good-faith intention to complete the transaction, and ordinarily forfeited if the buyer defaults." BLACK'S LAW DICTIONARY (8th ed. 2004).

> [t]here are no actions, suits, or proceedings pending by or, to [Pace's] knowledge, threatened against [Pace Airlines, Inc.] in any court or before any arbitrator of any kind or before any governmental body, except (A) litigation which is fully covered by insurance and concerning which all deductible payments by [Pace Airlines, Inc.] thereunder have been paid) [sic], (B) litigation set forth in Schedule 4(e)(i), and (C) litigation relating to the Liabilities [. . .].

(Motion, Ex. 1, ¶ 4(e).)

Defendants argue[17] that Pace had not fulfilled its obligation to disclose all litigation and, therefore, had itself breached the Purchase Agreement, justifying the automatic return of the Deposit to Jones. Gillette testified that he learned of this alleged breach from Global's attorney, Ron Bevans. However, Gillette's knowledge of this topic was very limited and consisted only of what he was told by the attorney. Under Rule 56 standards, what Gillette was told by Global's attorney is no more than hearsay that cannot properly be considered.[18]

---

[17] As already pointed out, Global, Gillette, and Kunkel have made no arguments in opposition to the motion for summary judgment against them.

[18] Gillette testified as follows:

| | |
|---|---|
| Q. | Did Global ever ask Pace to extend that closing date? |
| A. | We did. I believe if my recollection is correct due to an issue that came up pre-closing. |
| Q. | What was the issue? |
| A. | I was notified by Ron Bevans, our counsel, that there were some outstanding litigation issues that were pending against Pace. |
| Q. | What outstanding litigation issues? |
| A. | To the best of my recollection I was told there were three or four. I think two or three of them were related to Human Resource issues and one was related to a lease default. |

[* * *]

| | |
|---|---|
| Q. | I take it you don't know the names of those cases; correct? |
| A. | No. |

[* * *]

| | |
|---|---|
| Q. | And I take it you don't know what the underlying claims and issues and facts in those cases were; is that correct? |
| A. | That's correct. |
| Q. | And I take it you didn't know that information in November of 2007; correct? |
| A. | That's correct. I knew of those issues I believe it was the day before or the day of the execution of the purchase agreement. It was communicated to me via the telephone by Ron Bevans. |
| Q. | I take it that you don't know what the potential exposure to Pace was in any of those lawsuits; is that correct? |
| A. | No. |
| Q. | Is that correct? |
| A. | That's correct. |
| Q. | Did you ever inquire? |

13

PSS states that, once Gillette learned of the pending litigation, he felt that Pace had violated the terms of a Letter of Intent ("LOI") signed in the summer of 2007[19] and was not entitled to a return of the Deposit. (Gillette Dep. at 36.) Gillette testified as follows:

> Q.    What did Pace specifically not disclose?
> A.    They have never disclosed to us with a level of detail that any legal person or any banking person could understand what liabilities were outstanding and what the agreements were between the litigators on how these issues would be settled, and this became a big problem for us because Mr. Wong's attorney advised him that he should not come consummate the lending agreement because we could not be certain that we wouldn't be embroiled as Global as the new owners of Pace in litigation.
>
> [* * *]
> Q.    What legal matters are you referring to?
> A.    I'm referring to the matters that were told to me via the telephone by my counsel, Mr. Ron Bevans, on the day before the purchase agreement was signed by Mr. Kunkel and Pace, LLC.
> Q.    Can you tell me with particularity what those legal matters were and how much was at issue in each case?
> A.    I believe one of the outstanding litigation issues is the issue that I referred to earlier which is a turn-back issue of aircraft between Hooters Airline, Pace, LLC and the lessor. I believe it's in the value of approximately six or seven million dollars and then the other two or three outstanding litigations that one was, I think, was an age discrimination suit and two were sexual harassment suits and I have no idea of the value of that or any detail.

(Gillette Dep. at 43-43.) If it is true that Global learned about the undisclosed litigation the day *before* the Purchase Agreement was signed, it is impossible to explain why Global proceeded to execute the Purchase Agreement which contained the following language in ¶ 5(f): "Purchaser

---

> A.    Yes.
> Q.    Who did you inquire of?
> A.    I inquired through our attorney, Mr. Ron Bevans, to ask the counsel for Pace to provide us with all the documentation on the litigations that were outstanding since it had not been provided to us before and that we wanted to see the documents that related to how the litigation was going to be settled because Mr. Wong had requested that through me.

(Gillette Dep. at 30-32.)

[19] There does not appear to be a copy of this LOI in the record.

14

[Global] is not aware of any breach by Seller [Pace] of any representation or warranty contained in this Agreement."

Defendants argue that, at the very least, there is a material factual dispute over whether Pace was in breach of the Purchase Agreement due to its failure to satisfy conditions precedent to closing. However, when questioned as to whether Global had ever put Pace on notice that Global believed a breach had occurred which would have terminated (or perhaps invalidated) the Purchase Agreement, Gillette testified as follows:

> Q.  Global never informed Pace that Pace had failed to fulfill all of its conditions preceding to closing the transaction contemplated in the agreement; is that correct?
>
> A.  It's correct that we didn't do it in writing but we have communicated to my recollection on numerous occasions between the summer of 2007 and the fall of 2007 going into the early part of 2008 that we had felt that they had breached their fiduciary duty to provide us with all of the information we needed to consummate the deal.
>
> Q.  Did Global ever notify Pace or anyone acting on Pace's behalf in writing or in e-mail that Pace was in breach of the agreement?
>
> A.  I don't believe so unless Mr. Kunkel did that.

(Gillette Dep. at 32.) Paragraph 15 of the Purchase Agreement required that "[a]ny notice, consent, request, claim or other communication hereunder *shall be in writing* and shall be deemed to have been duly given if delivered personally, or by facsimile communication or mailed by Certified or Registered mail, postage prepaid [. . .]." (Motion, Ex. 1, emphasis added.) Given Gillette's admission at his deposition that no one from Global ever told Pace in writing that it was in breach of the Purchase Agreement, that argument is a red herring.

Under ¶ 3.1 of the Purchase Agreement, the Purchase Price was "payable in Federal Reserve Funds at Closing, less a credit for Earnest Money as provided in [Paragraphs] 3.2 and 3.3." (Motion, Ex. 1.) Paragraph 12(a) required the closing to "take place at 2:00 P.M. on or before November 30, 2007 [. . .]" and further provided: "[i]n the event that this transaction has

15

not closed by 5:00 P.M., Eastern U.S. Time, November 30, 2007, due to Purchaser's failure to close for any reason other than Seller's failure or inability to close pursuant to the terms and conditions of this Agreement, then Seller may terminate this Agreement and may retain the Earnest Money Deposit pursuant to Paragraph 3.3 herein." (Motion, Ex. 1.)

There is no dispute that the closing did not occur on or before November 30, 2007, and that Global never notified Pace in writing on or before that date that it believed Pace was in default of the Purchase Agreement. If Global had timely notified Pace of an alleged breach on Pace's part, indeed the Court might now be declaring that there was a factual issue for a trier of fact to determine (for both Pace's breach of contract claim against PSS and its breach of contract claim against Global); but that did not happen and Global's failure to close the deal constituted a breach of the Purchase Agreement.

Further, as explained in detail above, only Pace (as Seller), not Global (as Purchaser/Depositor), had been given the authority by both the Purchase Agreement and the Escrow Agreement to release PSS from its fiduciary duties and to instruct PSS to disburse the Deposit. Global, by usurping this authority, breached both the Purchase Agreement and the Escrow Agreement.

The argument of PSS that Pace committed a breach which justified Global's actions in directing PSS to release the Deposit is an after-the-fact fabrication, as is obvious from the evidence in the record. By defendants' own testimony, $500,000 was put up by Jones in return for a promise of repayment, plus $250,000, by November 30, 2007. The purchase and sale was also to have occurred on November 30, 2007, pursuant to the terms of the Purchase Agreement; however, for reasons that are not clear from the record but appear to have something to do with financing, that deadline could not be met and *Global* tried to move it to December 15,

16

2007. (Gillette Dep. at 141, 156-57.)[20] Pace was always ready, willing and able to perform by November 30, 2007.

On the early afternoon of November 27, 2007, three days before the Closing Date set by the Purchase Agreement and without Pace's knowledge, Daniel Tiffe of Global Advisors, sent an e-mail to Gillette with a subject line of "Escrow" and stating, in relevant part: "PSS is waiting for a release from Pace so that they can send the money back ASAP! The only way that PSS is comfortable releasing it is if PACE releases it." (Motion, Ex. 9.) Gillette responded an hour later: "Dan I will release PSS from Pace, there is no other way. Global will take full legal responsibility to release the funds back to the lender and we will pay the interest in full once the full closing has occured [sic]." (*Id.*). Thus, once defendants realized that they needed the Deposit to return it to Jones by their agreed deadline of November 30, 2007, although the closing would apparently not occur on that date, Global chose to release PSS because "there [was] no other way[,]" even though both the Purchase Agreement and the Escrow Agreement gave that power solely to Pace.

In summary, reading together the various terms of the Purchase Agreement and the Escrow Agreement, absent a breach of the Purchase Agreement by one of the parties, reflected in writing, the Closing Date was supposed to be November 30, 2007 and, thereafter, Pace had the responsibility to release PSS. If the closing did not occur due to a default on the part of Pace, reflected in writing, the Deposit would have automatically been returned to Global.[21] On

---

[20] Gillette testified that, even while they were trying to move the Closing Date by a couple weeks, there was never any discussion with or communication to Pace that Global felt Pace had already breached the Purchase Agreement by failing to disclose litigation or that the original Closing Date had not been met due to any fault of Pace. (Gillette Dep. at 156-57.)

[21] PSS has argued in opposition to the motion that the Purchase Agreement did not state that *only* Pace could release PSS from its duties regarding the Deposit and that, in fact, the Purchase Agreement contained a provision that the Deposit would not be released to Pace if the Agreement was not consummated because of "default by the Seller."

the other hand, if the closing did not occur due to a default on the part of Global, Pace had the authority to certify that fact to PSS and to give PSS instructions for the immediate release of the Deposit to Pace.

Instead, without notice to Pace, Global took it upon itself to release PSS three days before the agreed-upon Closing Date. The various communications in the record show that Global knew it did not have the authority to take such action but did so anyway, taking "full legal responsibility," because there was "no other way" (Motion, Ex. 9) to meet the commitment to return the $500,000 (plus interest) to Jones.

Under the facts set forth above and in light of the provisions of the Escrow Agreement and the Purchase Agreement, PSS unquestionably breached the Escrow Agreement by disbursing the Deposit without Pace's authorization and without any authority to make the disbursement and Global breached the Purchase Agreement by failing to close the deal on November 30, 2007 and by authorizing PSS to return the Deposit to Jones. Therefore, plaintiffs are entitled to summary judgment against PSS on Count Two of their complaint and against Global on Count One of their counterclaim.[22]

c.    **Conversion (Complaint Count Three and Counterclaim Count Two)**

Pace alleges a claim of conversion against PSS, Susan M. and Marilyn M. in Count Three of the complaint and against Global, Gillette and Kunkel in Count Two of the counterclaim.

---

PSS points to no specific provision in support of this argument. However, ¶ 7.02 does provide that if the conditions precedent remain unsatisfied and are not waived in writing within the stipulated time periods, "this [Purchase] Agreement shall be deemed terminated without the necessity of further documentation, *the Seller* shall return all Earnest Money deposits to Purchaser via same-day wire transfer, shall release PSS of any obligation to pay over to Seller the Initial Earnest Money Deposit, and neither party to this Agreement shall thereafter have any further right or claim against the other hereunder." (emphasis added.) Even under this section which addresses default by the Seller, it was Pace's responsibility (and right) to authorize the return of funds and to release PSS.

[22] The claims of breach were brought only against PSS and Global, not the individual defendants.

Conversion is defined as "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. General Motors Corp*, 49 Ohio St.3d 93, 96, 552 N.E.2d 172 (Ohio 1990).[23] To establish conversion, Pace must demonstrate that "(1) [it] demanded the return of the property from the possessor after the possessor exerted dominion or control over the property, and (2) that the possessor refused to deliver the property to its rightful owner." *Bush v. Signals Power and Grounding Specialists, Inc.*, No. 08CA88, 2009 WL 3087202, at *3 (Ohio App. 5 Dist. Sept. 25, 2009) (quoting *Congress Lake Club v. Witte*, No.2007CA00191, 2006 WL 39107 (Ohio App. 5 Dist. Jan. 3, 2006), quoting *Tabar v. Charlie's Towing Serv., Inc*., 97 Ohio App.3d 423, 427-428, 646 N.E.2d 1132 (Ohio App. 8 Dist. 1994)).

In this case, PSS, as escrow agent, was initially the lawful "possessor" of the Deposit. "Ohio courts, with fair consistency, have adhered to the rule that if one rightfully secured possession of the property of another he could not be held to have converted it, or to wrongfully possess it, until he failed to restore it upon demand, or by some act or circumstance of his own creation he knowingly and unlawfully exercised dominion over it." *Fidelity & Deposit Co. of Maryland v. Farmers & Citizens Bank of Lancaster*, 72 Ohio App. 432, 434, 52 N.E.2d 549 (Ohio App. 5 Dist. 1943).

There is no doubt that PSS converted the Deposit when it failed to return it to Pace upon Pace's demand. Although there is no evidence that Susan M., managing partner of PSS and a signer of the Escrow Agreement, or Marilyn M., an employee of PSS (but apparently not an officer) were ever in personal possession of the Deposit, under Ohio law, "an agent may be personally liable to a third person for acts of conversion done on behalf of his principal and

---

[23] *Reh'g denied*, 50 Ohio St.3d 709, 553 N.E.2d 691 (Ohio 1990).

within the scope of his authority." *Peterson v. Campbell*, No. 84AP-1063, 1985 WL 4352, at *3 (Ohio App. 10 Dist. Dec. 12, 1985); *see also, Schaefer v. D&J Produce, Inc.*, 62 Ohio App. 2d 53, 58, 403 N.E.2d 1015 (Ohio App. 6 Dist. 1978) (both agent and principal are liable for tortious misconduct by an agent within the scope of his employment.); *Cent. Benefits Mut. Ins. Co. v. RIS Admrs. Agency, Inc.*, 93 Ohio App.3d 397, 403, 638 N.E.2d 1049 (Ohio App. 10 Dist. 1994)[24] ("[w]hen a corporate officer commits a tort while in the performance of his duties, he is individually liable for the wrongful act.").

Here, Marilyn M., at the direction of Gillette who was acting on behalf of Global, told Susan M., Managing Partner of PSS, to release the Deposit to Jones, thereby making it impossible to give the Deposit to Pace when demand was made after the closing did not occur. No one has asserted that either Marilyn M. or Susan M. was acting outside the scope of their employment with PSS. Accordingly, under the undisputed facts of this case, plaintiffs are entitled to summary judgment against PSS, Marilyn M., and Susan M. on Count Three of the complaint.

In Count Two of Pace's counterclaim, it alleges that Global, Gillette and Kunkel improperly instructed PSS to release the Deposit to Jones and thereby exercised unauthorized dominion and control over that money, converting it to Pace's detriment.

Under the facts set forth above, it is clear that, under the Purchase Agreement, Global was required to make a $500,000 deposit as Earnest Money to assure its performance under the Agreement. Unbeknownst to Pace, Global obtained the money from Jones (through the assistance of Marilyn M. at PSS), in return for a promise to pay the money back plus $250,000 on November 30, 2007. When it became apparent that there would be no closing under the

---

[24] *Appeal not allowed*, 70 Ohio St.3d 1416, 637 N.E.2d 12 (Ohio 1994).

Purchase Agreement on November 30, 2007, Global, through Gillette and with the acquiescence of Kunkel,[25] improperly released PSS from its escrow obligations and told PSS to disburse the Deposit to Jones. In so doing, Global, Gillette and Kunkel wrongfully exercised dominion over the $500,000 that was rightfully Pace's money and engaged in conversion.

Accordingly, plaintiffs are entitled to summary judgment against Global, Gillette, and Kunkel on Count Two of their counterclaim.

### d.    Tortious Interference with Contract (Complaint Count Four)

In order to recover on a claim of intentional interference with a contract, plaintiffs must prove: "(1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages. *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863 (Ohio 1995), Syllabus ¶ 2.

---

[25] Kunkel testified at his deposition as follows:

| | |
|---|---|
| Q. | Were you aware of the fact that PSS was holding funds in escrow? |
| A. | Yes. |
| | * * * |
| Q. | Now, let me ask you a question, if I may. Mr. Gillette testified before, if I recall his testimony, that you were aware of the fact that he was releasing PSS of its escrow obligations to Pace on November 27th, 2007 when, in fact, he did so? |
| A. | Yes. |
| Q. | Would you agree with that statement? |
| A. | Yes. |
| Q. | Did you ever tell him that he should not do that and that it was in anyway [sic] improper? |
| A. | No. |
| Q. | Did you ever ask Mr. Gillette to rescind his instructions to PSS that it was released of its escrow obligations to Pace as of November 27th, 2007? |
| A. | No. |
| Q. | So you were aware of it at the time it occurred on November 27th, 2007; correct? |
| A. | Sometime in that time frame, yes. |
| Q. | And you never sought to undo that act; correct? |
| A. | That's correct. |

(Kunkel Dep. at 12-13.) Gillette also testified that all of "Global's directors and Global's executives," including Kunkel, were in agreement to release PSS from its escrow obligations and tell it to return the Deposit to Jones. (Gillette Dep. at 85-86.)

21

Without much discussion, plaintiffs argue that PSS, Susan M. and Marilyn M. tortiously interfered with the Purchase Agreement between Pace and Global. There is no doubt that a contract (the Purchase Agreement) existed and that the defendants knew about it. However, although Global did breach the Purchase Agreement, Pace fails to show from the record that such breach was *procured by the defendants*. Rather, the record shows that Global approached PSS (through Marilyn M.) and indicated that Pace was in breach of the Purchase Agreement and, therefore, PSS could release the Deposit. Even though PSS did not make any effort to ascertain whether this was true, it cannot be said that PSS, Marilyn M. or Susan M. caused or procured a breach of the Purchase Agreement by Global.

Plaintiffs are not entitled to summary judgment on Count Four of the complaint, having failed to meet their burden of proof on the elements of the claim of tortious interference with a contract.

### e.    Civil Conspiracy (Complaint Count Five and Counterclaim Count Three)

Pace alleges that the defendants conspired with the counterclaim defendants to convert the Deposit to Pace's detriment. Pace's argument is as follows: "Defendants and Third-Party [Counterclaim] Defendants both admitted that they had no contractual authority to release PSS from the Escrow Agreement on November 27, 2007 or to effectuate the payment of the Deposit to Jones. Despite that, they clandestinely agreed to do so because they felt impelled to do so: they had guaranteed the return of those funds to Jones. They combined with each other to orchestrate the conversion of the Deposit, then carried out that conversion by releasing PSS from its Escrow Agreement and disbursing the Deposit to Jones. They then sought to cover up their misdeeds by concocting a sham letter to Pace purporting to explain why PSS was refusing to heed Pace's payment demand." (Motion, at 23.)

22

"In Ohio, a civil conspiracy consists of the following: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 90 Ohio App.3d 284, 292, 629 N.E.2d 28 (Ohio App. 8 Dist. 1993) (citation omitted). "The element of 'malicious combination to injure' does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden v. Louis*, 116 Ohio App. 3d 195, 219, 687 N.E.2d 481 (Ohio App. 9 Dist. 1996) (citations omitted). In *Pumphrey v. Quillen*, 102 Ohio App. 173, 141 N.E.2d 675 (Ohio App. 9 Dist. 1955),[26] the court stated that not even a meeting is necessary and that "it is sufficient that the parties in any manner come to a mutual understanding that they will accomplish the unlawful design." *Id.* at 178.

Under other circumstances, the Court might conclude that defendants at most aided and abetted an illegal act by Global (as opposed to conspired with Global and, perhaps, Gillette and Kunkel) when, at Global's urging, they released the deposit to Jones.[27] The Court might so conclude because Marilyn M. testified at her deposition that when Gillette, acting on behalf of Global, told her to release the Deposit to Jones, she believed PSS would be protected by Global from any claim under the Escrow Agreement. (Marilyn M. Dep. at 143, 158.) However, because of the peculiar conflict-raising scenario set forth by the record in this case, and which facts are undisputed, the Court concludes differently.

Both defendants and counterclaim defendants admitted that they knew they had no contractual authority to release PSS from the Escrow Agreement on November 27, 2007.

---

[26] *Aff'd*, 165 Ohio St. 343, 135 N.E.2d 328 (Ohio 1956).

[27] *See Halberstam v. Welch*, 705 F.2d 472, 477-78 (D.C. Cir. 1983) for a discussion of the subtle difference between the tort of civil conspiracy and the related aiding and abetting theory of liability.

Global conspired with PSS, in particular through the actions of Marilyn M., to protect its own and Marilyn M.'s interests. In particular, Global needed to protect itself from loss by timely paying back Jones the $500,000 he had fronted to Global. It was already on the hook for the promised additional $250,000 and obviously did not want to also lose the $500,000. Similarly, Marilyn M. needed to protect herself from the loss of $30,000 which she had paid in advance to Jones as incentive for his investment. Susan M. joined the conspiracy when, at Marilyn M.'s direction and without investigating the facts (in her role as managing partner of PSS), she executed the check to pay Jones.  After the Deposit was released and Pace demanded its return because Global had failed to close the deal, the defendants and the counterclaim defendants conspired to cover up their misdeeds by creating a sham letter to Pace asserting that Pace had breached the Purchase Agreement and was not entitled to a return of the Deposit.

Accordingly, on this record, the Court concludes that plaintiffs are entitled to summary judgment on Complaint Count Five as to defendants PSS, Marilyn M., and Susan M. and on Counterclaim Count Three as to counterclaim defendants Global, Gillette, and Kunkel.

**2.      Summary Judgment with respect to Global's Crossclaim**

In its crossclaim against Pace, Global asserts a breach of contract and seeks $775,000 in damages, plus incidental and consequential damages, including lost profits, prejudgment interest, attorneys' fees and costs. The $775,000 in damages consists of a $500,000 earnest money deposit under ¶ 3.2 of the Purchase Agreement (which is different from the Deposit already addressed under ¶ 3.3) plus a $275,000 "non-refundable origination fee" which Global claims to have "paid to the lender." (Crossclaim ¶¶ 17-18.) Global also asserts a claim of unjust enrichment, seeking to recover the same $500,000 under ¶ 3.2, plus prejudgment interest,

24

attorneys' fees and costs. Pace moves for summary judgment on both claims; Global has not opposed the motion.

Global's crossclaim must fail in its entirety under the terms of the Purchase Agreement itself. In ¶ 10(b), the Purchase Agreement provides:

> (b) If the sale contemplated by this Agreement is not consummated as a result of the default of Seller [Pace] for any reason other than Purchaser's [Global's] default hereunder, [. . .] the Purchaser shall have the right to exercise all of the Purchaser's rights and remedies for such breach of contract by the Seller available in equity *for specific performance of this Agreement, as its sole remedy, which right of action shall be deemed waived if not filed in a court of competent jurisdiction within sixty (60) days from the date of the alleged default by the Seller.* (emphasis added).

As already noted, Global has never indicated in writing, as required by the Purchase Agreement, that Pace was in default. Further, even if Global had done so, under ¶ 10(b), as noted in the emphasized portion, Global's sole remedy was for specific performance (not damages) and any such claim would now be waived because it was not filed within sixty (60) days of Pace's alleged breach.

Contracts shortening statutes of limitation are valid under both Ohio law and Georgia law. For example, in *Sarmiento v. Grange Mut. Cas. Co.*, 106 Ohio St.3d 403, 835 N.E.2d 692 (Ohio 2005),[28] the court noted that "the parties to a contract may validly limit the time for bringing an action on a contract to a period that is shorter than the general statute of limitations for a written contract, as long as the shorter period is a reasonable one." *Id.* at 408 (citing *Miller v. Progressive Cas. Ins. Co.,* 69 Ohio St.3d 619, 624, 635 N.E.2d 317 (Ohio 1994); *Colvin v. Globe American Cas. Co.*, 69 Ohio St.2d 293, 295, 432 N.E.2d 167 (Ohio 1982), overruled on other grounds by *Miller v. Progressive*). The contract provision that reduces the

---

[28] *Recon. denied*, 107 Ohio St.3d 1701, 840 N.E.2d 205 (Ohio 2005).

limitations period "must be in words that are clear and unambiguous to the policyholder." *Sarmiento*, 106 Ohio St. 3d at 405 (citing *Colvin*, 69 Ohio St.2d at 296).

In the instant case, the words are clear and unambiguous and the sixty-day period for filing Global's lawsuit was reasonable in view of the fact that the Purchase Agreement, at ¶ 18(g), specifically stated that "[t]ime is of the essence[.]" *See also*, *Bullington v. Blakely Crop Hail, Inc.*, 294 Ga.App. 147, 150, 668 S.E.2d 732 (Ga.App. 2008) ("an insurance policy provision that places a one-year limitation upon the right of the insured to sue the insurer is valid and enforceable even though it shortens the period allowed by statute") (citing cases).

Accordingly, Pace is entitled to dismissal with prejudice of Global's crossclaim in its entirety and the same shall be ordered.

### 3. Pace's Claim for Punitive Damages

Pace argues in its motion that it is entitled to punitive damages against defendants and/or counterclaim defendants. To prevail on this assertion, plaintiffs must show that the defendants and/or counterclaim defendants acted with actual malice. "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill-will or a spirit of revenge, *or* (2) conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174 (Ohio 1987), syllabus.

On this record, plaintiffs fail to establish a right to punitive damages as a matter of law. While a trial on the merits could prove otherwise,[29] it appears that the defendants and counterclaim defendants acted more out of desperation (because they saw "no other way") than

---

[29] In fact, if what is set forth herein is the full extent of the evidence, the Court is doubtful that plaintiffs' claim for punitive damages will prove successful; however, since there was no cross-motion for summary judgment, the Court cannot declare as a matter of law that plaintiffs will not prevail on this claim.

out of "hatred, ill-will, or a spirit of revenge[ ]" or with "disregard for the rights" of Pace. Further, even at the time Global authorized PSS to release the Deposit to Jones, it appears that Global still held out hope that the deal would close by December 15, 2007 and there would be no harm caused by the early release of the Deposit. Unfortunately, that did not occur.

Accordingly, even based upon the undisputed facts of record, the Court finds that there is an insufficient basis upon which to enter judgment in favor of Pace, as a matter of law, relative to the issue of punitive damages.

### III. CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment (Doc. No. 89) is **GRANTED IN PART AND DENIED IN PART** as follows:

(1) summary judgment is **granted** in favor of plaintiffs Pace Airlines, LLC and Pace Airlines II, LLC against defendants Professional Settlement Services, LLC, Susan A. Mannarino and Marilyn A. Mannarino on Counts One, Two, Three, and Five of the First Amended Complaint, and **denied** on Count Four of the First Amended Complaint;

(2) summary judgment is **granted** in favor of counter-claimants Pace Airlines, LLC and Pace Airlines II, LLC against counter-defendants Global USA Holding, Inc., Bruce Gillette and John H. Kunkel on Counts One, Two and Three of the First Amended Counterclaim;

(3) summary judgment is **granted** in favor of cross-defendants Pace Airlines, LLC and Pace Airlines II, LLC on Counts One and Two of the Crossclaim and both of these counts are **dismissed with prejudice**; and

(4) plaintiffs are not entitled to recover punitive damages as a matter of law.

## IV. SUBSEQUENT PROCEEDINGS

In view of the Court's decision above, which requires a trial on compensatory damages and other relief,[30] and because the Third-Party Complaint has not been adjudicated, the Court needs to determine the course of subsequent proceedings. Accordingly, the Court hereby schedules a telephone status conference, with counsel only, for Wednesday, February 10, 2010 at 9:00 a.m. Counsel for Pace shall initiate the call.

**IT IS SO ORDERED**.

Dated: February 4, 2010

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[30] Plaintiffs' complaint and counterclaim both allege compensatory damages in the sum of *at least* $500,000 (in fact the counterclaim specifically seeks damages "exceeding the principal sum of $500,000), as well as punitive damages and reasonable attorneys' fees and costs. The Court is not certain under what legal theory plaintiffs believe they are entitled to *more than* the contractual amount of $500,000 in compensatory damages; however, given the way the pleadings are drafted, that question must remain for another day. Of course, the issue of attorneys' fees and costs is a matter better addressed in a motion. These issues will be discussed with counsel during the telephone conference.

28